# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

MARY IDA TOWNSON, Trustee,

    Appellant,

v.

                        CIVIL ACTION FILE NO.:
                        4:14-CV-00106-HLM

CHARLES DANIEL MCALLISTER,
and FRANCIS DIANE MCALLISTER,
deceased.

    Appellees.

## ORDER

This case is before the Court on Appeal from an Order

of the Bankruptcy Court for the Northern District of Georgia,

Rome Division (the "Bankruptcy Court") filed by Mary Ida

Townson, Chapter 13 Trustee (the "Trustee") [1].

## I.   Background

This case stems from a Voluntary Petition for Chapter 13 Bankruptcy filed by Charles and Francis McAllister ("Debtors") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") on February 28, 2011. (Bankruptcy Case No. 11-40606-pwb ("Bankruptcy Case"), Docket Entry No. 1.) At the time of filing, Debtors were a married couple living at 280 Wagner Drive, Dalton, Georgia. (See Voluntary Petition (Docket Entry No. 1-4) at 4.) Charles McAllister worked as a Truck Driver for RWT, Inc., while Francis McAllister was unemployed. (Id. at 25.) Debtors' Chapter 13 Petition listed a monthly income of $3,689.00 per month, expenses of $2,964.00 per month, and no dependents. (Id. at 25-26.) Debtors claimed an interest in the house and lot at 280

AO 72A

(Rev.8/82)

Wagner Drive, a 2000 Dodge Durango, a 1993 Dodge Pickup, and a 1996 Freightliner. (Id. at 13-14.)

On April 28, 2012, the Bankruptcy Court affirmed Debtors' Third Amended Chapter 13 Plan (the "Initial Plan"). (Bankruptcy Case, Docket Entry Nos. 27, 33.) The Initial Plan provided for an applicable commitment period of thirty-six months, a zero percent dividend to Debtors' unsecured creditors, and a monthly payment of $725.00 escalating to $960.00 over the course of the plan. (See Initial Plan (Docket Entry No. 28) at 1.)

For the following two years, Debtors executed the Initial Plan without incident. However, on March 2, 2013, Francis McAllister passed away. (Bankruptcy Case, Docket Entry No. 49.) As a result of Mrs. McAllister's death, her husband received $250,000 in life insurance proceeds (the

3

"Insurance Proceeds"). (Bankruptcy Case, Docket Entry No. 50.[1]) Mr. McAllister disclosed this receipt on an amendment to his schedules on May 2, 2013. (Id.) Debtors asserted that the Insurance Proceeds were exempt from becoming part of their bankruptcy estate. (Id.) These amendments also reflected a change in Mr. McAllister's occupation to "Caregiver," a change in the Debtors' income to zero, and the addition of three grandchildren as dependents. (Id.)

After the receipt of the life insurance funds, Debtors filed several requests for modification. (Bankruptcy Case, Docket Entry Nos. 51, 59, 69.) The last of these modifications (the "Debtors' Modification"), which is at the center of the instant dispute, provided for monthly payments

---

[1]Neither Party placed Bankruptcy Case Docket Entry Number 50 into the record of this case. However, the Parties do not dispute its contents, so the Court accepts its characterization as laid out in briefing. (See Appellant's Brief (Docket Entry No. 4) at 4.)

AO 72A

(Rev.8/82)

of $4,500.00 for the remainder of the plan amounting to a payout of $15,000.00 to unsecured creditors. (See Modified Plan (Bankruptcy Case, Docket Entry No. 69) ¶ 1.) The Trustee objected to Debtors' proposed modifications and exemption of the Insurance Proceeds. (Bankruptcy Case, Docket Entry Nos. 54, 55.) The Trustee also filed her own proposed modification (the "Trustee's Modification") on May 29, 2013. (Bankruptcy Case, Docket Entry No. 56.) The Trustee's Modification provided for payment in full of all claims, an amount totaling approximately $135,000.00.[2] (Trustee's Plan (Bankruptcy Case, Docket Entry No. 56) ¶ 3.) The Trustee also filed an Emergency Motion to Hold

---

[2]This represents a payment of $104,023.31 (including the Trustee's statutory fee) to Debtors' unsecured creditors, who were scheduled to receive nothing under the original plan, in addition to the previously confirmed payments to Debtors' secured creditors. (Appellant's Brief at 5.)

AO 72A

(Rev.8/82)

Funds in Escrow, which the Bankruptcy Court granted on October 7, 2013, requiring Debtors to place $104,023.31 in escrow pending further order of the Bankruptcy Court. (Docket Entry No. 67.) In November 2013, Mr. McAllister began receiving disability payments. (Hearing Tr. (Bankruptcy Case, Docket Entry No. 84) at 25.) He had received no income for the eight months prior to receiving disability. (Id.)

The Bankruptcy Court was then faced with two competing motions for modification. (Compare Debtors' Modification with Trustee's Modification.) On November 22, 2013, the Bankruptcy Court held an evidentiary hearing on the issue. (See Hearing Tr. at 1.) The Trustee argued that the Trustee's Modification should be approved (id. at 8-9), while Debtors requested either approval of the Debtors'

6

AO 72A

(Rev.8/82)

Case 11-40606-pwb   Doc 90   Filed 10/14/14   Entered 10/14/14 14:51:09   Desc Main
Case 4:14-cv-00106-HLM   Document 7   Filed 10/14/14   Page 7 of 35
Document      Page 7 of 35

Modification or denial of both the Trustee's and Debtors' Modifications (id. at 99).

During the hearing, the Trustee questioned Mr. McAllister about his use of the Insurance Proceeds. Mr. McAllister testified that of the $250,000.00 he received, he deposited $104,023.31 in an escrow account with his attorney pursuant to the Bankruptcy Court's previous instruction, and that $30,000.00 remained in his personal bank account. (Hearing Tr. at 43-44.) Mr. McAllister's recollection of how he spent the remaining $115,000.00 in Insurance Proceeds was imperfect at best. Mr. McAllister testified that he spent $30,000.00 on his wife's funeral (id. at 37-38), spent $8,000.00 on a 2005 Dodge pick-up truck (id. at 38), loaned around $12,000.00 to each of his two sons (id. at 45), purchased twelve burial plots for himself

7

AO 72A

(Rev.8/82)

and his grandchildren (id. at 50), purchased bedroom furniture for his granddaughter (id. at 51), fixed a four wheeler for his granddaughter (id. at 57), and purchased clothes for his grandchildren (id. at 65).

In general, the Court observes that Mr. McAllister's spending in the six months following receipt of the Insurance Proceeds was out of line with the expenses listed in the Debtors' Petition and subsequent amendments. Further, some of the Insurance Proceeds were unaccounted for, and Mr. McAllister was unable to explain every expenditure reflected in Debtors' bank records in the months leading up to the hearing. (See, e.g., Hearing Tr. at 72 ("Q: There's a cash withdrawal of $300.00 and an additional withdrawal of $1,500.00. . . . Do you have any recollection regarding those? . . . A: Let's see. I'm trying to

AO 72A

(Rev.8/82)

see. $300.00 was for a – that was cash to go in my pocket.
I'm pretty sure that's what that was. The $1,500.00, I'm not
really for sure.").) However, despite Mr. McAllister's lapses
in memory and occasionally rambling narrative, the Court
cannot find clear error with the Bankruptcy Court's
conclusion that "[a]lthough some of his uses of funds may
be questioned . . . it does not appear that, in general, he
spent the [Insurance] [P]roceeds to obtain anything near a
lavish lifestyle." (Modification Order (Bankruptcy Case,
Docket Entry No. 73) at 37.)

On April 3, 2014, the Bankruptcy Court issued its Order
on the proposed modifications (the "Modification Order").
(See Modification Order.) The Bankruptcy Court approved
the Debtors' Modification and rejected the Trustee's
Modification for two separate reasons: (1) the Court found

9

that because Debtors received the Insurance Proceeds more than 180 days after the confirmation of the Initial Plan, the proceeds never became a part of the estate pursuant to 11 U.S.C. § 541 (a)(5) and therefore were unable to be used in an involuntary modification under 11 U.S.C. § 1329 (see id. at 17-35); and (2), in the alternative, the Court exercised its discretion to deny the Trustee's Modification based on the specific facts and circumstances of this case (see id. at 35-40).

The Trustee appealed the Modification Order to this Court on May 7, 2014, challenging both the Bankruptcy Court's finding that the Insurance Proceeds never entered Debtors' bankruptcy estate, and the Bankruptcy Court's exercise of its discretion to reject the Trustee's Modification. The briefing process for the Trustee's Appeal is now

AO 72A

(Rev.8/82)

complete, and the Court finds the issues raised therein are ripe for resolution.

## II.    Jurisdiction and Standard of Review

The Court has "jurisdiction to hear appeals from final judgments, orders, and decrees [of the Bankruptcy Court]." 28 U.S.C. § 158(a)(1).  Specifically, the Court finds that it may review the Modification Order because it decided the underlying case on its merits and ended all litigation in that matter. See In re Brown, Nos. 6:07-cv-316-Orl-31, 6:07-cv-546-Orl-31, 2007 WL 3326684, at *1 (M.D. Fla. Nov. 6, 2007) (taking appeal from a bankruptcy court's post-confirmation order of modification).

The Court reviews de novo a bankruptcy court's conclusions of law.  Fed. R. Bankr. P. 8013; accord In re Cox, 338 F.3d 1238, 1241 (11th Cir. 2003).  The Court

11

reviews findings of fact for clear error.  Fed. R. Bankr. P.

8013; In re Sublett, 895 F.2d 1381, 1383 (11th Cir. 1990).

"A factual finding is not clearly erroneous unless this court,

after reviewing all of the evidence, [is] left with the definite

and firm conviction that a mistake has been committed." In

re Int'l Admin. Servs., Inc., 408 F.3d 689, 698 (11th Cir.

2005) (alteration in original) (internal quotation marks and

citation omitted).    The Court reviews de novo mixed

questions of fact and law in which legal issues predominate.

Matter of McWhorter, 887 F.2d 1564, 1566 (11th Cir. 1989).

Finally, in general, "[t]his court's function on appeal

from a Bankruptcy Court's determination is to reverse,

affirm, or modify only those issues that were presented to

the trial judge." United States v. Williams, 156 B.R. 77, 81

(S.D. Ala. Mar. 16, 1993); see also In re Air Conditioning,

AO 72A

(Rev.8/82)

Inc. of Stuart, 845 F.2d 293, 298 (11th Cir. 1998) (stating

that "[b]ankruptcy cases are to be tried in bankruptcy court"

and that "we will consider an issue not raised below [only]

if it involves a pure question of law and if refusal to consider

it would result in a miscarriage of justice").

## III.  Discussion

The Trustee raises three issues on appeal. First, the

Trustee questions the Bankruptcy Court's ruling that the life

Insurance Proceeds received Debtors more than 180 days

after confirmation were excluded from the Debtors' Estate.

(Appellant's Br. at 1.) Second, the Trustee questions the

Bankruptcy Court's ruling that the Trustee's Modification

failed to comply with 11 U.S.C. § 1329. (Id. at 2.) Finally, the

Trustee challenges the Bankruptcy Court's alternative ruling

that regardless of the statutory adequacy of the Trustee's

AO 72A

(Rev.8/82)

Modification, it would exercise its discretion to deny the Trustee's Modification and approve the Debtor's Modification.[3] (Id. at 2.)

Though it is tempting for the Court to espouse on whether the Insurance Proceeds became a part of Debtors' Estate, as that question has led to a split among the Eleventh Circuit's bankruptcy courts, the instant case is not an appropriate time to do so. Compare  In re Tinney, No. 07-42020-JJR13, 2012 WL 2742457, at *3 (Bankr. N.D. Ala.

---

[3] The Court notes that the Trustee does not take issue with the Bankruptcy Court's determination that regardless of "whether the life insurance proceeds are nonexempt property of the estate . . . [Debtors' Modification] . . . meets the best interest of creditors requirement" or its holding that "a debtor's receipt of a postconfirmation asset cannot possibly be 'disposable income' under its statutory definition . . . [so] [Debtors' Modification] does not run afoul of the projected disposable income test." (Modification Order at 11 & 14.) Consequently, the Court will not address these issues and adopts the Bankruptcy Court's finding that the Debtors' Modification satisfies the requirements of 11 U.S.C. § 1325(a)(4) and 1325(b) regardless of whether the insurance proceeds became part of the estate under 11 U.S.C. § 1306(a).

14

July 9, 2012) (finding that life insurance proceeds received more than 180 days after confirmation became part of the bankruptcy estate for purposes of evaluating a § 1329 modification) <u>with</u> <u>In re Key</u>, 465 B.R. 709, 710-12 (Bankr. S.D. Ga. Feb. 12, 2012) (finding that life insurance proceeds received more than 180 days after confirmation were excluded from the bankruptcy estate for purposes of evaluating a § 1329 modification). The Bankruptcy Court's alternative holding – that even if the Trustee's Modification was statutorily acceptable it would nonetheless use its given discretion to affirm the Debtors' Modification – provides adequate grounds for affirmance of the Modification Order. Consequently, the Court limits the following discussion to the discretion issue and assumes that the Insurance Proceeds became a part of the Debtors' Estate and that

15

both the Trustee's Modification and Debtors' Modification
satisfied the non-discretionary requirements of 11 U.S.C. §
1329.[4]

## A.   Discretion and 11 U.S.C. § 1329

11 U.S.C. § 1329 begins by stating:

> At any time after confirmation of the plan but
> before the completion of payments under such
> plan, the plan <u>may</u> be modified, upon request of
> the debtor, the trustee, or the holder of an allowed
> unsecured claim.

11 U.S.C. § 1329(a) (emphasis added). The "may" in that
code section indicates Congress' intention that the

---

[4]Because the Bankruptcy Court did not reach the issue of
whether the Insurance Proceeds were <u>exempted</u> as opposed tp
excluded, the Court would not rule on the statutory acceptability of
the Trustee's Modification at any rate. (<u>See</u> Modification Order at
18 ("[T]he [Bankruptcy] Court need not determine whether Mr.
McAllister is a dependent for purposes of his ability to exempt the
proceeds under O.C.G.A. § 44-13-100(a)(11)(C).").) Instead, if the
Court found that the Insurance Proceeds became a part of Debtors'
Estate, it would remand the case for further evaluation of the
exemption issue.

AO 72A

(Rev.8/82)

Bankruptcy Court maintain some degree of discretion over whether to approve a proposed plan.[5] See In re Powers, 202 B.R. 618, 620 (B.A.P. 9th Cir. 1996) ("Because modification under § 1329 is discretionary, review is limited to a determination of whether the bankruptcy court abused its discretion in modifying the plan."). Indeed, the instant circumstances in which the Bankruptcy Court faced two statutorily acceptable plans demonstrate why bankruptcy

---

[5] 11 U.S.C. § 1325(a)(3), satisfaction of which is a requirement of modification under 11 U.S.C. § 1329(b)(1), also gives bankruptcy courts a degree of discretion in evaluating proposed modifications. It requires that "the plan has been proposed in good faith." 11 U.S.C. § 1325(a)(3). However, the Court agrees with the Bankruptcy Court's conclusion that Debtors' "decision to voluntarily use some but not all of the life insurance proceeds to pay claims when nothing in the statute requires him to do so cannot show an absence of good faith." (Modification Order at 15.) Indeed, this case differs greatly from In re Hargis, cited by the Trustee, in which a debtor sought to reduce her plan payments following receipt of approximately $450,000 in life insurance proceeds and 401(k) funds. See In re Hargis, No. 09-64398, 2013 WL 5414090 at *6-7 (Bankr. N.D. Ohio Aug. 23, 2013).

AO 72A

(Rev.8/82)

courts must be given some leeway to either choose the modification plan they find most appropriate or deny modification altogether. Therefore, the first question the Court must answer is what guideposts should steer a bankruptcy court's discretionary decision under § 1329.

Congress wrote very little guidance into § 1329 that would be of help to a Bankruptcy Court judge facing the instant conundrum of multiple statutorily acceptable proposed modifications. See In re Powers 202 B.R. at 622 ("[T]he only limits on modification are those set forth in the language of the Code itself, coupled with the bankruptcy judge's discretion and good judgment in reviewing the motion to modify."). Indeed, during the November 22, 2013, hearing, the Trustee essentially conceded that "[t]here is no standard that is out there in case law or otherwise for the

18

court to rely on as far as reviewing a Chapter 13 Trustee's motion to modify." (Hearing Tr. at 14.)

In briefing, both Parties cite to In re Forte, 341 B.R. 859 (Bankr. N.D. Ill. 2005), for the standards by which the Bankruptcy Court's discretionary decision making should be judged. That court wrote:

> Any exercise of judicial discretion under the Bankruptcy Code should be informed by the two fundamental concepts of a fresh start for debtors and fairness to creditors. These nebulous concepts have somewhat more substance in the chapter 13 context. Some cases refer to the contract between a debtor and creditors formed by confirmation of the chapter 13 plan. Others refer to the "Chapter 13 Deal," which I prefer to call the chapter 13 bargain. The concept . . . is simple:

> > In place of liquidating non-exempt assets to pay creditors under chapter 7 of the Bankruptcy Code, Congress gave individuals with regular income the option of adjusting their debts pursuant to a plan under chapter 13. The chapter 13 deal permits a debtor to retain all prepetition property, including

AO 72A

(Rev.8/82)

earnings, assets, money in the bank and real estate. In exchange for keeping all of these assets, the debtor must commit all postpetition disposable income to the payment of creditors under a chapter 13 plan for a period of three to five years. If the debtor makes all of the payments required under the plan, all of the debtor's dischargeable debts are discharged, and the debtor keeps all of the prepetition assets.

This bargain defines the relationship between a debtor and creditors for the duration of the case. A motion under § 1329 is simply an attempt to revise that contractual relationship. Because the motion is an attempt to change the status quo, its decision will often depend on who has the burden of proof. Either a debtor will have to prove the fairness of reducing plan payments or shortening the term of the p[l]an. Or a trustee or creditor will have to prove the fairness of increasing payments or lengthening the term. At the risk of belaboring the obvious, denial of a motion to modify simply results in the original bargain going forward. Just as the chapter 13 bargain embodies a Congressional determination of overall fairness, I conclude that the determination of a motion under § 1329 seeking to adjust that bargain properly depends on the fairness of the proposed

AO 72A

(Rev.8/82)

modification, viewed in light of all the circumstances.

<u>In re Forte</u>, 341 B.R. at 869-70 (citations and footnotes omitted).

In addition to § 1329's statutory thresholds and the general fairness concerns touched on in <u>In re Forte</u>, other courts around the country have required a Trustee seeking a § 1329 modification to demonstrate a "change in circumstances" along with the statutory acceptability of the proposed modification. See <u>In re Murphy</u>, 474 F.3d 143, 149 (4th Cir. 2007) ("[T]he doctrine of res judicata prevents modification of a confirmed plan pursuant to §§ 1329(a)(1) or (a)(2) unless the party seeking modification demonstrates that the debtor experienced a 'substantial' and 'unanticipated' post-confirmation change in his financial

21

condition." (internal citation omitted)); <u>In re Flennory</u>, 280 B.R. 896, 898 (Bankr. N.D. Ala. 2001) ("On a practical level, a standard of substantial change in circumstances is a necessity [for confirmation of a § 1329 modification]."). Though such a "change in circumstances" is not specifically written into the code, <u>see In re Witkowski</u>, 16 F.3d 739, 744 (7th Cir. 1994) ("[N]either § 1329 nor the doctrine of res judicata impose any threshold change in circumstance standard."), the Court finds that requiring an unanticipated change in the debtor's condition to be sensible and in line with congressional intent, <u>see</u> H.R. Rep. No. 95-595 at 124 <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963 at 6086 ("<u>If a problem arises in the execution of the plan</u> the bill permits modification of the plan." (emphasis added).). Indeed, allowing debtors, trustees, or holders of allowed secured

22

AO 72A

(Rev.8/82)

claims to file for modifications based on nothing more than a change of heart would be a burden on courts and debtors who would face uncertainty as to the long term viability of their plans. However, as discussed below, there is little doubt that Debtors experienced a dramatic change in circumstances in this case.

With these general considerations in mind, the Court turns to the Bankruptcy Court's holding.

### B. Whether the Bankruptcy Court Abused its Discretion

Bankruptcy Court explained its decision to exercise discretion to deny the Trustee's Modification as follows:

> [Debtors] filed this case under chapter 13 primarily to keep their residence in which they had lived since 1990. Had Mrs. McAllister not died unexpectedly and had Mr. McAllister's physical condition not deteriorated, they would have come out of their case with their residence, Mr.

23

McAllister would continue to work, and the life insurance policies on their lives would provide a source of funds for the survivor's support in later years. Creditors in this case could not have had a different expectation.

Things did not work out that way. Mr. McAllister became unable to work shortly before his wife's death, and she died unexpectedly. Given Mr. McAllister's age, medical condition, and inability to work, it is clear to the Court that Mr. McAllister needs the insurance proceeds that the Trustee's modification would pay to creditors for his future support and for the support of his family.

A primary factor for the Court to consider in exercising its discretion to approve or disapprove a modification is the debtor's ability to pay. It is true, of course, that a substantial amount of money is available to pay creditors in full. But doing so would severely impair an aging, disabled debtor with little prospects for significant future income or any way to replace an asset that he and his wife counted on to sustain them in future years.

Application of the ability to pay standard requires a realistic assessment of the debtor's financial situation and must include consideration of the

24

debtor's future needs. The need to consider a
debtor's future needs arises from the "fresh start"
policy of chapter 13 that is one of the fundamental
concepts that properly guides a court's discretion.
In the circumstances  of this case, Mr. McAllister
cannot use the proceeds to pay his creditors
without substantial harm to future needs. Because
of that clear need, he does not have the ability to
pay without impairing the "fresh start" that the
Bankruptcy Code promises.

Application of the ability to pay standard in this
manner is not unfair to creditors. They could not
have expected the untimely death of Mrs.
McAllister. They did not extend credit on the basis
of her life insurance policy, and they are receiving
no less than what the original plan promised or
what they would receive if this were a chapter 7
case.

In this regard, it is noteworthy that [Debtors] could
easily have obtained chapter 7 relief, but at the
cost of losing their residence of over 20 years.
Their decision to proceed under chapter 13
instead of chapter 7 affected, in reality, only one
other creditor: the lender holding a security deed
on the home. That lender will receive at least the
value of its claim, i.e., the value of its collateral, 11
U.S.C. § 1325(a)(5)(B). Taking into account the

25

additional costs the lender would have incurred and possibly the lower value that the lender would have received if it had proceeded with foreclosure, the result of this chapter 13 case is arguably economically beneficial to the lender.

Mr. McAllister's retention of his home is an important benefit that he received from proceeding under chapter 13 rather than chapter 7. But that benefit does not justify depriving him and his family of the expected benefit of life insurance proceeds upon the death of his wife because it occurred far earlier than anyone expected.

This is not a "windfall" case. A windfall occurs when a debtor receives an unanticipated, fortuitous, and significant benefit without earning it or planning it. Examples of windfalls include a debtor's winning the lottery or receiving a substantial inheritance or life insurance proceeds upon the death of someone other than a spouse.

The situation here differs dramatically in nature and degree from such "windfall" circumstances. A debtor in her 40's with stable employment receiving significant proceeds upon the death of a parent is in a far different situation than Mr. McAllister because she has continuing income for her support and the opportunity in future years to

26

AO 72A

(Rev.8/82)

save for her retirement years. Mr. McAllister, in contrast, has neither. And surely Mr. McAllister would prefer to have his wife instead of the insurance money. His situation is a tragedy, not a windfall.

To the contrary, full payment of the creditors in this case would be a windfall to them. Again, they could not have anticipated this situation and clearly did not rely on it in extending credit or in evaluating their treatment under the original plan. Of course, creditors expected to be paid and did not anticipate that [Debtors] would end up in bankruptcy. Nevertheless, a debtor's bankruptcy is always a possibility; once it happens, consideration of fairness to creditors takes place in the context of bankruptcy principles. No concept of fairness to creditors in a bankruptcy case requires that they receive the benefit of Mrs. McAllister's death due to the fortuitous circumstance that it occurred before the debtors completed their payments under the plan rather than after.

Finally, the Court notes that Mr. McAllister has proposed to commit a significant amount of the proceeds to his unsecured creditors that will permit them to receive almost 15 percent of their claims. This is much more than the creditors would

27

have received  in a chapter 7 case and, as such, is a fair result for them.

In the totality of the circumstances of this case, the Court concludes in the exercise of its discretion that it is not appropriate to approve the Trustee's modification.

(Modification Order at 38-40 (footnote omitted).)

Having reviewed the detailed reasoning given by the Bankruptcy Court for its ruling on the Modification Order, the Court cannot find that its disapproval of the Trustee's Modification was an abuse of discretion. The Bankruptcy Court faced a unique situation in that there were essentially two "changes of circumstances," each of which could have justified upward or downward modification to plan payments if they occurred in isolation. First, Mrs. McCallister passed away, forcing her co-debtor and husband to quit his job and remain at home to care for several dependent children. That

28

loss of a job and income, without any other surrounding circumstances, would justify a § 1329(a)(1) reduction in payments. See, e.g., In re Johnson, 458 B.R. 745, 748 (B.A.P. 8th Cir. 2011) ("[Debtor's] loss of his second job income of $1,240.00 per month represents a substantial change in circumstances entitling Mr. and Mrs. Johnson to modify their plan under § 1329 to reduce their payments."). However, as a result of his wife's death, Mr. McAllister received a substantial life insurance payment, which is an event that often triggers upward modifications in debtors' contributions to their bankruptcy plans. See, e.g., In re Tinney, 2012 WL 2742457, at *3 (finding that inheritance from death of debtor's mother justified upward modification under § 1329). The Bankruptcy Court's decision to resolve these competing interests in favor of the Debtors'

29

Modification, which provided for additional payment to unsecured creditors but not full payment, was not so unjustified as to constitute an abuse of discretion.

The Bankruptcy Court also duly considered the "ability to pay" and "fairness to creditors" guideposts. While it is true that Debtors now have the funds to cover a check paying their secured creditors in full, the ability to pay standard means more than dollars in a bank account. Indeed, the United States Court of Appeals for the Eleventh Circuit wrote that "[u]nder the ability-to-pay standard, creditors share both the gains and losses of the debtor." In re Waldron, 536 F.3d 1239, 1246 (11th Cir. 2008) (emphasis added). Here, the Bankruptcy Court appropriately determined that requiring Debtors to pay their unsecured creditors the full $104,023.31 owed, including the Trustee's

AO 72A

(Rev.8/82)

fee, while leaving Debtors with only $30,000.00 and a reduced monthly income to support Mr. McAllister and his grandchildren was not an appropriate distribution of the Insurance Proceeds.

Further, while perhaps there is merit to the Trustee's argument that a distribution of only $15,000.00 to unsecured creditors was not a fair means of "sharing" the Insurance Proceeds, the Bankruptcy Court did not have the option of finding middle ground. It had to choose from the Trustee's Modification, the Debtors' Modification, or leaving the current plan – which paid the unsecured creditors nothing – in place. In other words, the Trustee took a risk by requesting full payment instead of a more conservative split between Debtor and unsecured creditors. That the Bankruptcy Court's decision did not reward that risk does

31

not make the decision unreasonable.

The Bankruptcy Court's decision was also sufficiently fair to creditors. Debtors' creditors could not have expected Mrs. McAllister's death would occur before completion of the Debtors' Chapter 13 Plan, and did not extend credit based on her life insurance policy in the first place. Indeed, the Debtors' Modification provides unsecured creditors with $15,000.00 more than they were entitled to receive on the date of the Initial Plan's confirmation. While creditors may feel entitled to a larger cut of the Insurance Proceeds, the Bankruptcy Court had limited choices, and this Court cannot find that its decision to deny the creditors payment in full was an abuse of discretion. The Court agrees with the Bankruptcy Court that this is not a "windfall" case. Debtors did not win the lottery or receive an inheritance from the

32

AO 72A

(Rev.8/82)

death of a distant relative. Debtors lost an important contributor to the welfare of their household. Though Mr. McAllister was compensated for that loss by the Insurance Proceeds, it was not unreasonable for the Bankruptcy Court to find this situation differed from a typical § 1329 windfall case.

Finally, the Bankruptcy Court's decision is appropriately mindful that "[t]he principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367 (2007). Here, Debtors went into Chapter 13 proceedings believing that, when their payments were made and their plan completed, they would still have each other, and, as a means of financial security in old age, life insurance policies to benefit the survivor of the two. (See

33

AO 72A

(Rev.8/82)

Hearing Tr. at 36-37 ("Q. Why did you buy life insurance? A. Well, we wanted some to have for us in case, you know, one of us died, for our income you know, something for us to have. . . . Like I didn't have a 401(k) plan or anything like that so we had to have something for retirement.").) Under the Trustee's Modification, not only would Mr. McAllister be left without his wife, but without adequate savings or income to support himself and his dependent grandchildren. Indeed, had Debtors used a traditional means of saving for retirement instead of purchasing life insurance because Mr. McAllister "figured that [he'd] be killed in a truck" (id. at 37), those savings would have been excluded from Debtors' estate in the first place, 11 U.S.C. § 541(b)(7) (excluding contributions to ERISA governed employee benefit plans). Under these circumstances, the Court finds that the

34

Bankruptcy Court properly considered Debtors' entitlement to a fresh start when rejecting the Trustee's Modification.

## IV. Conclusion

ACCORDINGLY, the Court **AFFIRMS** the Order of the Bankruptcy Court [1, 1-26] and **DIRECTS** the Clerk to **CLOSE** this case.

IT IS SO ORDERED, this the 14 day of October, 2014.

_____
UNITED STATES DISTRICT JUDGE

AO 72A

(Rev.8/82)